AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original  ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
5/13/2022
CENTRAL DISTRICT OF CALIFORNIA
BY:       DTA       DEPUTY

# UNITED STATES DISTRICT COURT
for the

**FILED**
May 13, 2022
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY   *Nancy Boehme*
Deputy Clerk, U.S. District Court

Central District of California

UNITED STATES OF AMERICA

v.

STEPHEN GLOVER
and TRAVIS McKENZIE

Defendant(s)

<span style="color:red">UNDER SEAL</span>
Case No. 2:22-mj-01920-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 2020 to June 2021, in Los Angeles County, within the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Jeffrey Wolf, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     May 13, 2022

**DOUGLAS F. McCORMICK**
*Judge's signature*

City and state:   Santa Ana, California

Douglas F. McCormick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Charles  Pell x 3542

# A F F I D A V I T

I, Jeffrey Wolf, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    I make this affidavit in support of a criminal complaint against, and arrest warrants for, Stephen GLOVER (year of birth: 1989) and Travis McKENZIE (year of birth: 1996) for violating Title 18, United States Code, Section 1341 (Mail Fraud).

2.    The facts set forth in this affidavit are based upon my personal observations, my review of the documents and records discussed herein, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF SPECIAL AGENT JEFFREY WOLF

3.    I am a Special Agent (SA) with the United States Department of Labor, Office of Inspector General (DOL-OIG), and have served in this capacity for a year and a half.  I am presently assigned to the Los Angeles Regional Office.  My responsibilities as a DOL-OIG SA include investigating Unemployment Insurance (UI) fraud, mail fraud, identity theft, and other related crimes.  I am a graduate of the Federal Law

Enforcement Training Center (FLETC) in Glynco, Georgia.  As part
of the training provided at FLETC, I successfully completed the
Basic Training course, which included, but was not limited to,
courses in criminal and constitutional law.  Additionally, I
have completed the Inspector General Academy at FLETC in Glynco,
Georgia.  Before my employment with DOL-OIG, I was employed for
five years as an investigator for the DOL, Office of Labor
Management Standards, responsible for conducting civil and
criminal investigations.  I also served on active duty with the
United States Coast Guard for more than 13 years, and more than
nine years with the United States Coast Guard Reserve.

4.    Through my training and experience, including
discussions with other law enforcement officers experienced in
investigating crimes involving UI and benefits fraud, I have
become familiar with the methods used by people who commit
benefits fraud offenses.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    The DOL-OIG, United States Postal Service - Office of
Inspector General (USPS-OIG), California Employment Development
Department (EDD), and the Los Angeles County Sheriff's
Department (LASD) have been investigating a fraudulent scheme in
which perpetrators fraudulently apply for and obtain UI benefits
under the Pandemic Unemployment Assistance (PUA) provisions of
the federal Coronavirus Aid, Relief, and Economic Security
(CARES) Act, a provision that was designed to help unemployed
individuals obtain UI benefits as part of the nation's response
to the economic harms caused by the COVID-19 pandemic.

6.   Federal and state law enforcement uncovered and investigated an unemployment insurance fraud, identity theft, and mail fraud scheme perpetrated by McKENZIE and GLOVER in 2020 and 2021.  GLOVER was a U.S. Postal Service mail carrier at the time and abused his position to further the fraudulent scheme.

7.   When interviewed, both McKENZIE and GLOVER confessed to engaging in a scheme to defraud EDD, which included using EDD debit cards in other people's names to withdraw thousands of dollars in cash from ATMs.  GLOVER also admitted that to execute the fraudulent scheme, he used his position as a U.S. Postal Service mail carrier to assist McKENZIE (who lived on GLOVER's mail route) with intercepting, stealing, and possessing U.S. Mail intended for others.  In addition to stealing EDD-related mail, GLOVER also admitted to stealing personal and business checks from the U.S. mail.

8.   During the execution of search warrants at the residences of McKENZIE, GLOVER, and GLOVER's girlfriend in May and June 2021, law enforcement discovered and seized credit/debit cards in the names of other people, many of which had been issued by state workforce agencies such as California EDD and Virginia's Employment Commission.  The searches also revealed large volumes of stolen mail, including personal and business checks intended for third parties.  In total, more than 200 pieces of stolen mail and EDD-related mail and debit cards were seized during the searches.

9.   Subsequent investigation also uncovered that McKENZIE, his girlfriend, and GLOVER worked in concert to create fake EDD

profiles and apply for COVID-related UI benefits, often using stolen identities, with mailing addresses on GLOVER's route that GLOVER had provided.

10.   Thus far, the investigation has uncovered that in their fraudulent scheme, GLOVER and McKENZIE, together with other co-schemers, fraudulently caused more than 50 EDD debit cards containing approximately $800,000 in COVID-related UI benefits to be mailed to addresses primarily along GLOVER's mail route, including McKENZIE's residence, which were then used to withdraw cash, transfer funds, or for personal expenditures.

## IV. STATEMENT OF PROBABLE CAUSE

### A.   Background on Unemployment Insurance Benefits

11.   Since 1935, the U.S. Department of Labor's UI program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own.  This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while the worker seeks employment.  UI beneficiaries who meet the requirements of the applicable state law are eligible for this temporary financial assistance.  Each state administers a separate UI program within the guidelines established by Federal law.  In the state of California, EDD administers the UI program for residents and others physically performing work activities in California.

12.   Generally speaking, regular UI claimants must be: (1) unemployed through no fault of their own; (2) able and available for work; (3) willing to accept suitable work; and

(4) actively seeking work.

      **B.**    **Pandemic Unemployment Assistance under the federal CARES Act**

13.  On March 13, 2020, the President of the United States declared COVID-19 to be an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. As a result, Congress passed the CARES Act, which the President signed into law on March 27, 2020. The CARES Act provides over $2 trillion in economic relief protections to the American people for the public health and economic impacts of COVID-19.

14.  Prior to the enactment of the CARES Act, to be eligible for UI administered by EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim. Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

15.  The CARES Act established a new program – PUA – to provide unemployment benefits during the COVID-19 pandemic to people who do not qualify for regular unemployment insurance benefits, including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic. UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

16.  Under the PUA provisions of the CARES Act, a person who is a business owner, self-employed worker, independent contractor, or gig worker can qualify for PUA benefits administered by EDD if s/he previously performed such work in California and is unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19-related reason.[1] Examples of non-business-owner occupations that may qualify a person for PUA benefits are realtor, barber, hairstylist, freelance photographer, construction handyman/woman, gardener, and ride-share driver.[2]

17.  California EDD began accepting applications for PUA benefits on or about April 28, 2020.  To make benefits available as quickly as possible, payments are issued in phases.  If a

---

[1] COVID-19 related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID-19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

[2] To be eligible, such person must also not be participating in the UI Elective Coverage program.  Under the provisions of the California Unemployment Insurance Code (CUIC), employers may elect UI and State Disability Insurance (SDI) or only Disability Insurance (DI) coverage for themselves.  Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

> Phase 1: For claims with start dates from February 2 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.
>
> Phase 2: For claims with start dates from March 29 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.
>
> Phase 3: For claims with start dates from July 26 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.
>
> Phase 4: Phase 4: For claims with start dates from December 27, 2020, to the end of the program (which ended on September 4, 2021), $167 plus $300 per week for each week the claimant is unemployed due to COVID-19. Claimant may qualify for PUA benefits for up to a total for up to a total of 57 weeks (minus any regular UI and FED/ED benefits received). PUA benefits ended September 4, 2021. The last day one could apply for a PUA claim was October 6, 2021, for the weeks of unemployment before September 4, 2021.

18. PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

19. A UI claimant can usually collect 26 weeks of regular state UI benefits.  The CARES Act provides for additional Pandemic Emergency Unemployment Compensation (PEUC), which

provides up to 13 weeks of additional payments, for a total of
39 weeks of benefits.  PEUC is available to persons who were or
are fully or partially unemployed at any time between from March
29 through December 26, 2020.  Persons with a regular UI claim,
a PUA claim or a PEUC extension filed between March 29 and July
25, 2020, also receive Federal Pandemic Unemployment
Compensation ("FPUC"), which is the extra $600 per week.

    20.  On August 8, 2020, after FPUC expired, the President
of the United States signed a Presidential Memorandum
authorizing FEMA to use disaster relief funds pursuant to
Section 408 Other Needs Assistance of the Stafford Act to
provide supplemental payments for lost wages to help ease the
financial burden on individuals who were unemployed as a result
of COVID-19. The "Lost Wages 10 Assistance Program" (LWAP)
served as a temporary measure to provide an additional $300 per
week via a total of $44 billion in FEMA funds. The period of
assistance for LWAP was August 1, 2020, to December 27, 2020, or
termination of the program, whichever was sooner. On December
27, 2020, the President signed into law the Consolidated
Appropriations Act, 2021. The guidance provides states with
important information about several provisions of the law,
including the extension of programs first authorized by the
CARES Act earlier, as well as the creation of a new UI benefit
for "mixed earners."

    21.  The law extends the PUA program created by the CARES
Act, which provides UI benefits to gig workers and others not
traditionally eligible for them. Under the law, the end of the

period of applicability for the PUA program extends to those weeks of unemployment ending on or before March 14, 2021. In states where the week of unemployment ends on a Sunday, the last payable week of PUA is the week ending March 14, 2021 (March 13 if weeks of unemployment end on Saturday). For individuals on PUA who have not exhausted their benefit eligibility of up to 50 weeks, the program also provides for continuing benefits for eligible individuals for weeks of unemployment through April 5, 2021. The law also strengthens documentation requirements to ensure PUA program integrity.

22.  Additionally, FPUC, which expired July 31, 2020, is reauthorized and modified to provide $300 per week to supplement benefits for weeks of unemployment beginning after December 26, 2020, and ending on or before March 14, 2021. FPUC is not payable with respect to any week during the gap in applicability, that is, weeks of unemployment ending after July 31, 2020, through weeks of unemployment ending on or before December 26, 2020.

23.  On March 21, 2021, the President signed into law the American Rescue Plan Act (ARPA) of 2021. The law extended certain programs first authorized by the CARES Act beyond the expiration date of March 14, 2021, to September 6, 2021. FPUC, which expired on March 14, 2021, was reauthorized to provide $300 per week through the week ending on or before September 6, 2021.

24.  Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their

applications.  Claimants enter their total income for the 2019
calendar year on the application.  The stated income will be
used to pay the minimum benefits of $167 per week.  EDD may
request documentation to provide proof of the stated income.[3]  If
the income information provided by the PUA claimant meets an
annual earnings threshold of $17,368 or more, the EDD will work
as quickly as possible to verify the claimant's income using
other resources available to EDD in order to increase the PUA
weekly benefit amount.

25.  Like regular UI claims, PUA claims can be filed
online.  When an individual files a PUA claim online, EDD
automatically maintains certain information regarding the filing
of the claim.  This information includes the date and time the
claim was submitted, the name of the person for whom the claim
was filed, and the IP address of the computer, or ISP account,
that was used to file the claim.

26.  A PUA claimant must answer various questions to
establish his/her eligibility for PUA benefits.  The claimant
must provide his/her name, Social Security Number, and mailing
address.  The claimant must also identify a qualifying
occupational status and COVID-19 related reason for being out of
work.

27.  After it accepts a UI claim, including a claim
submitted pursuant to the PUA program, EDD typically deposits UI
funds every two weeks to an EBP debit card administered by the

---

[3] In general, EDD accepts items such as tax returns, IRS
Forms 1099 and W-2, and paystubs as proof of income.

BofA, which the claimant can use to pay for his/her expenses. The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim. Claimants can activate their debit card over the phone or online.

28.  When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits.  EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.

29.  Weekly PUA benefits typically range from $40 to $450. In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

30.  The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of Electronic Benefit Payment (EBP) debit cards administered by Bank of America (BofA) that are used to access UI benefits.  In fraudulent claim schemes, co-schemers then use the EBP debit cards to withdraw fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines and point of sale (POS) purchases at merchants across the United States.

31.  Based on my training and experience, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, among other indicia:

11

a. Co-schemers commonly buy or outright steal the identities of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds. Co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

b. Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.

c. Submitting multiple UI claims from the same IP address for multiple claimants. These claims are sometimes submitted on the same day close in time.

d. Failing to provide a phone number or providing a wrong number on multiple UI claims so it may be difficult to reach the identity holder.

C. **May 2021: Search of McKENZIE and his girlfriend's residence**

32. Based on my review of investigative reports and my conversations with other law enforcement officers and agents who have participated in this investigation, I am aware of the following:

a. On or about May 19, 2021, the Honorable Suzette Clover, Los Angeles County Superior Court, authorized and signed a search warrant for the residence located at xx841 Arroyo Park Drive, Apt. 812, Valencia, California 91355 (McKENZIE

residence[4]), and three persons, including McKENZIE.

      b.   On or about May 20, 2021, the LASD executed the search warrant at the McKENZIE residence during which they encountered McKENZIE and D.S.L. Following the search, McKENZIE and D.S.L. were arrested by LASD. I have reviewed police reports, evidence, and related items from the warrants executed by LASD, from which I know the following:

      c.   During the search of the McKENZIE residence, the following items were discovered:

      i.   Over 170 pieces of EDD mail addressed to more than 50 different names using the McKENZIE residence as their purported mailing address, while other mailings contained mailing addresses in Bakersfield, Fresno, Los Angeles, and Torrance, California. The addressees on the mail included S.P., C.S., R.S., D.G., M.S., M.M., W.S., I.T., L.M., K.A., and J.T.

      ii.   At least five pieces of mail from the Virginia Employment Commission (VEC) addressed to three[5] different names: S.P., C.S., and R.S.

      iii.  At least 14 pieces of general mail addressed to at least nine different names.

      iv.  A check in the name of R.C. issued from the

---

   [4] The lease associated with xx841 Arroyo Park Drive, Apt. 812, Valencia, CA 91355 is in the name of D.S.L and her (D.S.L.'s) father. During an interview, McKENZIE admitted to residing at the residence with D.S.L.

   [5] Duplicative PUA claims were filed with both the EDD and VEC using the same three identities of S.P., C.S., and R.S. Claims with both EDD and VEC unemployment insurance claims used the McKENZIE residence as their mailing address.

County of Los Angeles.

             v.    13 California EDD EBP debit cards in the names of others:

                  (I)  Card ending in 6643 in the name of K.B.

                  (II) Card ending in 4290 in the name of I.T.

                  (III)    Card ending in 0419 in the name of C.R.

                  (IV) Card ending in 0922 in the name of A.J.

                  (V)  Card ending in 5478 in the name of M.B.

                  (VI) Card ending in 4629 in the name of S.S.

                  (VII)    Card ending in 1113 in the name of D.H.

                  (VIII)    Card ending in 2853 in the name of B.A.

                  (IX) Card ending in 6369 in the name of D.G.

                  (X)  Card ending in 8846 in the name of W.S.

                  (XI) Card ending in 9843 in the name of C.S

                  (XII)    Card ending in 6329 in the name of M.M.

                  (XIII)    Card ending in 6013 in the name of R.S.

             vi.  Three VEC debit cards in the names of others:

                  (I)  Card ending in 4393 in the name of C.S.

                  (II) Card ending in 0708 in the name of R.S.

                  (III)    Card ending in 4937 in the name of S.P.

14

vii. One Chase Freedom credit card ending in 6780 in the name of T.M.

viii.    One Wells Fargo debit/credit card ending in 9219 in the name of P.A.

ix.  Two cell phones

x.   Two computers

xi.  One iPad

xii. At least four Bank of America (BofA) ATM withdrawal receipts identifying a total of $4,000 in cash withdrawals from an ATM in Newhall, California, using the following debit cards:

(I)  California EDD EBP debit card in the name of K.B., ending in 6643;

(II) California EDD EBP debit card in the name of W.S., ending in 8846;

(III)    California EDD EBP debit card in the name of C.R., ending in 0419; and

(IV) California EDD EBP debit card in the name of B.A., ending in 2853.

D.   **McKENZIE's arrest and subsequent confession**

33.  Based on my review of investigative reports and my conversations with other law enforcement officers and agents, I am aware of the following:

a.   After McKENZIE was arrested, McKENZIE was transported to the Crestena Valley Sheriff's Station Jail where he was read his *Miranda* rights and agreed to speak to LASD Detectives D. Gaisford and L. Phillipi, who then conducted an

audio-recorded interview of McKENZIE.

       b.   I reviewed that recording and the police report of McKENZIE's interview, from which I learned the following in part:

       i.  McKENZIE is originally from New York and was currently unemployed.

       ii.  McKENZIE and D.S.L. are the only occupants who reside at unit 812, also known as xx841 Arroyo Park Drive, Apt. 812, Valencia, CA (McKENZIE's residence).

       iii. McKENZIE's cell phone ends in 7096.

       iv.  McKENZIE acknowledged possessing at least 10 EDD debit cards in the names of others.

       v.  McKENZIE claimed the EDD debit cards were supposed to be picked up by the person who got him into "the EDD."

       vi.  McKENZIE and D.S.L tried to help family members apply for EDD.  After applying for D.S.L.'s family members, McKENZIE and D.S.L failed to receive at least two EDD debit cards associated with D.S.L.'s family members' claims.

       vii. McKENZIE believed the mailman might have been responsible for the EDD debit cards not being delivered.

       viii.   McKENZIE later observed an African American mailman delivering mail at the community mail box located at the apartment complex he and D.S.L. lived at in Valencia, California.  During his observations, McKENZIE allegedly witnessed the mailman stealing mail.

       ix.  McKENZIE approached the mailman who he knew

as "Erin" (known to law enforcement as GLOVER) and questioned the mailman about various undelivered EDD mail to his apartment (McKENZIE residence).  GLOVER reportedly admitted to McKENZIE that he (GLOVER) was stealing EDD cards.

x.   GLOVER allegedly asked McKENZIE to work with him in exchange for money.

xi.  McKENZIE reportedly agreed to accept mail from EDD in the names of others at his residence (McKENZIE residence). GLOVER offered McKENZIE between $250 and $500 per EDD debit card delivered to him (McKENZIE).

xii. McKENZIE sometimes returned the EDD debit cards to GLOVER after making cash withdrawals at BofA ATMs to take his "cut."  On a $1,000 withdrawal, McKENZIE would receive $250 and GLOVER would receive $750.

xiii.   McKENZIE admitted to making more than 10, but less than 30, ATM cash withdrawals with EDD cards, and he said he split the monies associated with those withdrawals with GLOVER.

xiv. McKENZIE admitted to receiving "a lot" of mail from EDD in the names of others while working with GLOVER.

xv.  McKENZIE was aware of some of the EDD debit cards having $30,000 to $40,000 balances on them.

xvi. McKENZIE tried making cash withdrawals on some of the EDD debit cards left at his residence by GLOVER but the cards had been turned off.

xvii.   GLOVER was responsible for delivering mail in the names of others to McKENZIE's residence.

17

xviii.    GLOVER was also responsible for processing change of addresses with the bank that enabled EDD debit cards to be routed for delivery to McKENZIE's residence.

xix. The information needed to change the address with the bank was the social security number and email associated with the EDD account.

xx.  McKENZIE admitted to receiving personal and business checks made payable to others that GLOVER had stolen from the mail.

xxi. McKENZIE was supposed to find a way to cash them.

xxii.    The delivery of EDD debit cards to McKENZIE's residence occurred primarily between May and September 2020.

xxiii.    McKENZIE believed the EDD debit cards were associated with real individuals because California used Id.me.[6]

xxiv.    McKENZIE acknowledged corresponding with GLOVER via text message regarding the scheme.

xxv. On McKENZIE's phone, GLOVER was saved as "mailman."

xxvi.    McKENZIE stopped communicating with GLOVER after the Post Office changed his mail route.

xxvii.    McKENZIE admitted to being affiliated

---

[6] On or about October 5, 2020, EDD implemented ID.me to confirm the identity of applicants.  As part of the identity verification process, a facial recognition scan can be done using a smart phone.

with the *Mac Baller* Bloods gang in New York.

**E.    June 2021: Searches of GLOVER's residence and his girlfriend's separate residence**

34.   Based on my review of investigative reports and my conversations with other law enforcement officers and agents who have participated in this investigation, I am aware of the following:

a.   On or about June 15, 2021, the Honorable Suzette Clover, Los Angeles County Superior Court, authorized and signed a search warrant for a residence located on Catania Ct., Palmdale, CA 93552 (GLOVER Residence), GLOVER's person, and GLOVER's girlfriend A.D.'s residence located on E. Nugent Street, Lancaster, CA 93534 (A.D. residence.)

b.   On or about June 17, 2021, the LASD executed the search warrants at the GLOVER and A.D. residences.  During the search of the GLOVER residence, GLOVER was encountered there. Following the search, GLOVER was arrested by LASD.  I reviewed police reports, evidence, and related items from LASD, from which I know the following:

c.   During the search of the GLOVER residence, the following items were discovered:

i.   Three pieces of EDD mail with EDD EBP debit cards in the names of others:

(I)   Card ending in 6752 in the name of S.M.

(II)  Card ending in 7444 in the name of R.M.

(III)    Card ending in 9467 in the name of K.Br.

ii.  One cell phone

d.  During the search of A.D.'s residence, the
following items were discovered:

i.  At least 25 pieces of mail from EDD
addressed to at least 15 different names primarily using mailing
addresses in Valencia and Santa Clarita, California, on GLOVER's
USPS mail route, including McKENZIE's residence.

(I)  The addressees on the mail included
I.T., L.M., K.A., D.G., D.B., K.B., S.P., and J.T, W.S., J.K.,
R.M., K.Br. and S.M.  Mail addressed to the some of those same
names was also located during the search of McKENZIE's
residence.

ii.  11 personal and business checks made payable
to different names at addresses in the Valencia area, which
appear to be on or near GLOVER's mail route.

35.  A total of more than 200 pieces of stolen mail were
found during the 2021 searches of McKENZIE and his girlfriend's
residence, GLOVER's residence, and GLOVER's girlfriend's
residence.

**F.  <u>GLOVER's confession</u>**

36.  Based on my review of investigative reports and my
conversations with other law enforcement officers and agents
involved in the investigation, I am aware of the following:

a.  During the execution of the search warrant at his
residence, GLOVER was detained and read his *Miranda* rights.  On
site, LASD Det. Gaisford, USPS-OIG SA S. Lanzl, and EDD CI I.
Romo conducted an audio-recorded interview of GLOVER.

b.    At the conclusion of the search, GLOVER was arrested and transported to the Crescenta Valley Sheriff Station where he was Mirandized and interviewed by LASD Detectives Gaisford and Ventigan, which was recorded.

c.    I reviewed the recordings and reports of both of those interviews, from which I learned the following in part:

i.    GLOVER acknowledged being employed by the USPS at the Valencia Post Office.

ii.   GLOVER's cellular phone number ended in 7787.

iii.  GLOVER told law enforcement they were at his home because of a person he knew as *guapo* (subsequently identified as McKENZIE).

iv.   GLOVER met McKENZIE on his mail route, during which MCKENZIE introduced GLOVER to EDD fraud.

v.    McKENZIE routed EDD debit cards to addresses on GLOVER's mail route, and GLOVER would intercept the EDD debit cards and provide them to McKENZIE.

vi.   McKENZIE was responsible for making the fake EDD accounts and sending mail to addresses on GLOVER's route.

vii.  McKENZIE did not care if the addresses on GLOVER's route were vacant or occupied.

viii.    McKENZIE would drive around and ask GLOVER if certain addresses were part of his mail route.

ix.   Initially, McKENZIE did not tell GLOVER he was going to "put in" EDD applications and send mail to those addresses.

21

x.    Shortly after GLOVER met McKENZIE, a lot of EDD mail started to be sent to addresses on GLOVER's mail route addressed to people who GLOVER knew did not live there.

xi.   GLOVER kept those pieces of mail, which he knew was wrong, but he did so because McKENZIE expected GLOVER to "grab em," and GLOVER did not want anyone to know McKENZIE was sending mail to those addresses.

xii.  GLOVER stated "I got myself into with him but he didn't even f**king know the dude like that, like and was just, he wouldn't stop, he'd just keep sending shit, sending shit…"

xiii.    McKENZIE gave GLOVER $1,000 in exchange for two EDD debit cards that GLOVER had intercepted in the U.S. Mail.

xiv.  GLOVER kept a lot of the EDD mail in his personal residence, as well as at his girlfriend A.D.'s home.

xv.   In addition to stealing the EDD debit cards from the U.S. mail, GLOVER stole other EDD correspondence sent in the mail.  He did so to avoid returning a lot of EDD mail to the post office and raising suspicion.

xvi.  In addition to intercepting EDD debit cards, GLOVER stole mail containing checks with the intention of giving the stolen checks to McKENZIE.

xvii.    GLOVER acknowledged knowing that stealing mail was wrong.

xviii.    GLOVER admitted to using two of the EDD debit cards that he had stolen from the U.S. Mail to make cash

withdrawals at ATMs in Valencia, California.  He estimated that he withdrew approximately $4,000 to $5,000 from ATMs.

xix. GLOVER activated the EDD debit cards he used by calling EDD.  GLOVER received the PIN by knowing the last four digits of the SSN associated with the EDD account.  GLOVER received the last four digits of the SSN by intercepting other EDD mail that contained the last four digits of the SSN.

xx.  GLOVER confirmed the mail he stole was on mail route 46 in zip code 91355.

xxi. When shown a photograph of McKENZIE, GLOVER positively identified McKENZIE as the person he knew as *guapo*.

xxii.    In addition to stealing EDD-related mail, GLOVER admitted to stealing approximately 10-11 personal and business checks from the U.S. mail.

xxiii.    GLOVER estimated the value of the stolen checks to total approximately $22,000.

xxiv.    GLOVER specifically recalled discussing the stolen checks via text message with McKENZIE.

xxv. GLOVER supplied McKENZIE with five or six addresses on his (GLOVER's) mail route, which McKENZIE could use to send EDD mail.

xxvi.    GLOVER knew to steal all EDD mail and provide it to McKENZIE.

xxvii.    GLOVER knew McKENZIE needed both the EDD debit card and the letter from EDD containing the last four digits of the SSN.

xxviii.    GLOVER stopped communicating with

McKENZIE because he knew what he was doing was wrong and
McKENZIE was a scam artist.

xxix.     GLOVER felt bad about stealing mail,
but claimed he did it because he was "broke" and needed money.

**G.   Text messages between McKENZIE and GLOVER**

37.  Based on my review of investigative reports and my
conversations with other law enforcement officers and agents who
have participated in this investigation, I am aware of the
following:

a.   DOL-OIG Assistant Special Agent in Charge (ASAC)
Marcus Valle reviewed Cellbrite[7] phone extraction reports of
digital devices seized on May 19, 2021, from McKENZIE and his
girlfriend's residence, and digital devices seized on June 17,
2021, from GLOVER's residence, which contained text messages
between MCKENZIE, using phone number ending in 7096, and GLOVER,
using phone number ending in 7787.  ASAC Valle provided me with
a sampling of text messages transcriptions between McKENZIE and
GLOVER during which both appear to be discussing their
fraudulent scheme.

b.   Based upon my review of the following text
messages, it appears that GLOVER and McKENZIE were working
together to procure and/or use debit cards and/or mail in other
people's names.

c.   On or about December 20, 2020, McKENZIE and
GLOVER had the following conversation via text message:

---

[7] Cellbrite is software program primarily used to review
digital devices and highlight important data.

           i.   McKENZIE: "Somebody on ur route snatched 2 of my jawns wassup with that?"

           ii.  McKENZIE: "LMK what time u heading to me bro I need those been missing days on those"

           iii. GLOVER: "Imma be headed out ther in 10 min bro"

           iv.  GLOVER: "I should be out there around 1230."

           v.   McKENZIE: "Alright bet"

           vi.  McKENZIE: "Bring all 3 u have gang"

           vii. GLOVER: "Bet"

           viii.   MCKENZIE: "Eta gang"

           ix.  MCKENZIE: "Lmk"

           x.   GLOVER: "I'm be hopping off the fwy in 10 bro"

           xi.  McKENZIE: "Alright Kopy"

           xii. McKENZIE: "Lmk when u outside I'm gonna come outside to u"

           xiii.   GLOVER: "light Fasho"

           xiv. McKENZIE: "Not trynna rush just missed mad days and they starting to cut niggas cards off and shit"

           xv.  GLOVER: "Nah you good bro I know them days be running out quick that's why I'm tryna get it to u"

      d.   Between on or about December 28, 2020, and on or about December 29, 2020, MCKENZIE and GLOVER had the following conversation via text message:

           i.   McKENZIE: "Gonna send something along the route gonna text u the name to grab it for me Brody"

        ii.  GLOVER: "Yo I got u might have to pull a couple of strings cuz I'm out rn jus take care of me bro and I got u fasho"

        iii. McKENZIE: "light I got y for sure gang"

        iv.  McKENZIE: "Send me a few addresses along ur route gang"

        v.   McKENZIE: "Addys vrody"

        vi.  McKENZIE: "Brody need it rn lol"

    e.  On or about January 19, 2021, GLOVER and McKENZIE had the following text message conversation:

        i.   GLOVER: "xxx616 moreno dr 91355"

                "xx706 via thomas dr 91355"

                "xx055 bellis dr 91355"

                "xx049 bellis dr 91355"

                "xx025 arroyo park dr #15 91355"

                "xx091 bellis dr 91355"

        ii.  McKENZIE: "Gonna do 3 cards to each address the most"

        iii. McKENZIE: "Bet good looks gang the ones without apartment numbers is houses?"

        iv.  GLOVER: "All good just lmk when u send em so I'll be on the lookout"

        v.   GLOVER: "Yea the ones with no numbers is cribs"

        vi.  McKENZIE: "And anything u see going to my address grab it and lmk"

        vii. GLOVER: "Gotchu"

     f.   On or about January 20, 2021, McKENZIE and GLOVER had the following text message conversation:

        i.  McKENZIE: "Yoo"

        ii.  GLOVER: "Yo"

        iii. McKENZIE: "If u run into real cc and real checks u know what to do I pay fir [sic] those too"

        iv.  GLOVER: "Bet i kinda got a nigga I be juggin wit but I'll fucc with you if it's good money"

        v.  McKENZIE: "Facts bro always good bred with me"

        vi.  GLOVER: "Fasho imam keep you tapped in bro"

        vii. McKENZIE: "Look out for 5 yards on ur route"

        viii.   McKENZIE: "Any credit cards or debit cards that come through too we could do sum with them"

     g.   On or about January 22, 2021, McKENZIE sent the following text message to GLOVER:

        i.  McKENZIE: "Yoo, if u cN [sic] find me personal chase checks grab them shits we can be millionaire"

        ii.  McKENZIE: "Yoo hit me"

     h.   On or about January 23, 2021, McKENZIE and GLOVER had the following conversation via text message:

        i.  McKENZIE: "Lmk which house/bank it's from"

        ii.  GLOVER: "They all different banks and shit hella different address"

        iii. McKENZIE: "Oh they all add up to 22k not just one is 22k?"

        iv.  GLOVER: "Yea"

     v. GLOVER: "Couple big ones and some baby ones"

     vi. GLOVER: "Hit me when u can so we can chop I ain't tryna send no info thru text"

    i. Between on or about January 28 and 31, 2021, MCKENZIE and GLOVER had the following conversation via text message:

     i. McKENZIE: "J[] K[][8]"

     ii. McKENZIE: "xx016 Monteno Dr

     iii. McKENZIE: "Yoooo hit me"

     iv. McKENZIE: "Yooo please tell me u still on that route gang like 10 cards landing today"

     v. GLOVER: "Yea I'm still on it we don't do mail on Sunday g tomorrow they should be there"

    j. Between on or about February 11 and 12, 2021, McKENZIE and GLOVER had the following conversation via text message:

     i. McKENZIE: "J[] K[]"

     ii. McKENZIE: "xx016 Moreno Drive, Valencia, CA 91355"

     iii. McKENZIE: "Yooo gang"

     iv. McKENZIE: "Hit me Brody"

     v. GLOVER: "Yowhats good I still aint see no card come thru yet just the papers with the socials.still waiting"

---

  [8] J.K. is an identity that was used to file a PUA application with EDD.

      vi.  McKENZIE: "Grab those for me too gang"

     vii. GLOVER: "I know wassup"

**H.**   **Text messages between McKENZIE and D.S.L.**

38.  Based on my review of investigative reports and my conversations with other law enforcement officers and agents who have participated in this investigation, I am aware of the following:

    a.  ASAC Valle reviewed Cellbrite phone extraction reports of digital devices seized on May 20, 2021, from the residence of MCKENZIE and his girlfriend D.S.L., which contained text messages between MCKENZIE, using phone number ending in 7096, and D.S.L., using phone number ending in 7467.  ASAC Valle informed me that between in or around August 2020 and in or around April 2021, McKENZIE and D.S.L. appeared to discuss the scheme and actions they took to execute the scheme.

    b.  According to ASAC Valle, McKENZIE and D.S.L. engaged in text messages where they appeared to discuss defrauding various state unemployment insurance programs, including California and Virginia.  McKENZIE and D.S.L. used text messages to send and receive directions necessary to execute the scheme, such as:

      i.  Sending PII of others to McKENZIE to use in the filing of fraudulent UI applications.

     ii.  Identifying physical addresses to be used in order to route UI benefit cards to McKENZIE, which included D.S.L.'s and McKENZIE's residential address in Valencia, California, as well as addresses of D.S.L.'s family and friends

who resided in the Bakersfield, California, area.

iii. Creation of "fake" email accounts in the names of others to be used when creating EDD profile accounts during the application process.

iv.  Sending and receiving lists of EDD applicant names, some of which were ID theft victims, so that D.S.L and/or her family and friends could be on notice to receive mail in those names.

v.   Directives to receive/retrieve EDD mail and other correspondence.

vi.  Conducting EDD weekly certifications to enable benefits to be issued.

vii. Solicitation of names, social security numbers, driver's license numbers, and dates of birth of identities, which could be used by McKENZIE to file fraudulent UI applications.

c.   In addition to the above, McKENZIE and D.S.L. appeared to acknowledge the criminal activity occurring on a number of different occasions, which the following conversations exemplify.

39.  According to ASAC Valle's review of Cellbrite phone extraction reports and text message transcriptions, McKENZIE and D.S.L had the following conversations via text messages on or about the following dates:

a.   August 18, 2020: MCKENZIE sent D.S.L. a list of 10 names of EDD applicants whose EDD cards MCKENZIE was routing to an address affiliated with D.S.L. in Bakersfield.

   b.   September 8, 2020:  McKENZIE tells D.S.L. the
following with respect to her IP address…"?? I dint want them
having our IP address when I'm calling up the cards etc"

   c.   October 3, 2020:

   i.   McKENZIE: "They just pulling over ppl
randomly in LA now to see if they have EDD cards on them"

      ii.  D.S.L.: "sigh"

      iii. D.S.L.: "you alright right"

      iv.  D.S.L.: "you don't have none right?"

   d.   October 24, 2020: McKENZIE tells D.S.L. the
following in part"... I'm about to come back to California and
do some more EDD cause I came out here to get a 18wheeler to
start my business and I did that now it's time to work on my
money."

   e.   November 9, 2020: McKENZIE and D.S.L. had the
following conversation via text message:

      (I)  McKENZIE: "Trying to get ppl to sign up
for California Edd verify themselves then send me they login if
u know anyone that need my help getting it too Lmk love."

      (II) D.S.L.: "okay I will"

   f.   January 22, 2021: McKENZIE states the following
to D.S.L.: "60 apps is 1.8 mil"

   g.   March 3, 2021: McKENZIE tells D.S.L. that "I'm
gonna teach u how to do Virginia unemployment love and give u
some pros to use so u can make a lot of money too."

   h.   May 19, 2021: McKENZIE informs D.S.L. of a
problem activating what is believed to be an EDD card, stating

"…I did 2 other ppp's that was been supposed to come but they
not here yet like shit still say pending this dumb ass nigga
still ain't send the pic so can't activate these cards and
fucking edd cut the cards I got off talking bout verify the
addresses and I need money to even get the fake proof of
addresses made Smfh it's a lot I be having to deal with fr fr"

        i.   On multiple occasions, McKENZIE texted D.S.L.
that he is "doing apps" (believed to be referring to the
electronic filing of UI applications with EDD).

      **I.**    **Research re: EDD Cards tied to McKENZIE and/or GLOVER**

40. Based on my review of investigative reports and my
conversations with other law enforcement officers and agents who
have participated in this investigation, I am aware of the
following:

        a.   On July 23, 2021, BofA investigator J. Wilkinson
informed ASAC Valle that at least 23 EDD EBP debit cards
containing unemployment insurance benefits were mailed by BofA
to McKENZIE's residence in Valencia, California.  Of those 23
EDD EBP debit cards, 22 were in the names of others, and one was
in the name of D.S.L.

        b.   In addition to the EDD EBP debit cards mailed to
McKENZIE's residence, BofA identified a link between the above
referenced claims and two EDD EBP debit cards mailed to xx016
Moreno Drive, Valencia, CA (which the investigation identified
as an address provided to McKENZIE by GLOVER).

        c.   As of July 12, 2021, BofA reported that the above
25 EDD EBP debit cards had been loaded with a total benefit

amount of $411,626.  At least $318,771 of that $411,626 had been liquidated via ATM cash withdrawals, direct deposit funds transfer to checking/savings, purchase of goods or services, and teller cash withdrawals.

d.    Between in or around February and March 2022, EDD Criminal Investigator (CI) Ignacio Romo identified additional claims associated with this fraudulent scheme, which brought the suspected total loss of GLOVER and McKENZIE's fraudulent scheme to approximately $798,733, based upon approximately 52 fraudulent PUA claims.  Of those 52 claims, 44 claims listed the McKENZIE residence as the mailing address, five claims listed two other addresses in the Valencia/Santa Clarita area of Los Angeles, three claims used two addresses in Bakersfield, California, and one claim listed an address in Hayward, California.[9]

e.    Four of the 13 EDD debit cards found during the search of McKENZIE's residence were used to make cash withdrawals at a drive-thru ATM on or about December 18, 2020, for the following amounts:

i.    CA EDD debit card in the name of K.B., ending in 6643 in the amount of $1,000.

ii.   CA EDD debit card in the name of C.R., ending in 0419 in the amount of $1,000.

---

[9] Both of the Bakersfield addresses were used in the applications for EDD cards that were found during the search of McKENZIE's residence.  Likewise, the Hayward address was used in the applications for an EDD card that was found during the search of McKENZIE's residence.

          iii. CA EDD debit card in the name of B.A., ending in 2853 in the amount of $1,000.

          iv.  CA EDD debit card in the name of W.S., ending in 8846 in the amount of $1,000.

       f.  ASAC Valle obtained ATM surveillance photos from BofA, which revealed that on or about December 18, 2020, a male fitting the physical description of McKENZIE made cash withdrawals from a BofA drive-thru ATM between 9:06 p.m. and 9:10 p.m. using a silver four door sedan.[10]

**J.**  **Victim K.B.**

41.  As noted above, one of the EDD EBP debit cards that McKENZIE used to make a cash withdrawal of at least $1,000, which was also found in McKENZIE's residence when it was searched, was in the name of K.B.

42.  Based on my review of records provided to me by EDD and conversations with other agents and investigators who have participated in this investigation, I know the following:

       a.  On or about November 24, 2020, a PUA claim in the name of K.B. was filed with EDD, stating that claimant K.B. was unemployed because of the COVID-19 pandemic.

       b.  The PUA application contained K.B.'s name, date of birth (DOB), Social Security Number (SSN), and alleged that K.B. was employed as an assembler/production.  The claim identified a last employer as Paramount Pictures.

---

    [10] Based upon observations during the 2021 searches, McKENZIE's girlfriend D.S.L drives a vehicle matching the physical description of the vehicle depicted on those ATM surveillance photographs.

c.    The claim listed McKENZIE's residential address as K.B.'s reported mailing address.

d.    The filing of the PUA claim triggered an EBP debit card ending in 6643 in the name of K.B. to be generated and sent by U.S. Mail to K.B. at the listed mailing address, which was McKENZIE's residence.

43.   On or about April 21, 2022, ASAC Valle interviewed K.B. by telephone regarding the PUA claim that had been filed in K.B.'s name.  Based on ASAC Valle's report, I know that K.B. told ASAC Valle the following:

a.    K.B. has never resided or worked in, nor visited, California.

b.    K.B. confirmed that the DOB and SSN provided on the PUA claim in her name belonged to her.

c.    K.B. had never been employed as an assembler/production.

d.    K.B. never lived in Valencia, California.

e.    K.B. never filed a PUA claim with California EDD and did not authorize anyone to file a claim in his or her name.

**K.    Victim W.S.**

44.   As noted above, one of the EDD EBP debit cards that McKENZIE used to make a cash withdrawal of at least $1,000, which was also found in McKENZIE's residence when it was searched, was in the name of W.S.

45.   Based on my review of records provided to me by EDD and conversations with other agents and investigators who have participated in this investigation, I know the following:

35

a.   On or about November 19, 2020, a PUA claim in the name of W.S. was filed with EDD, stating that claimant W.S. was unemployed because of the COVID-19 pandemic.

b.   The PUA application contained W.S.'s name, DOB, SSN, and alleged that W.S. was employed as an assembler/production.  The claim identified a last employer as Paramount Pictures.

c.   The claim listed McKENZIE's residential address as W.S.'s reported mailing address

d.   The filing of the PUA claim triggered an EBP debit card ending in 8846 in the name of W.S. to be generated and sent by U.S. Mail to W.S. at the listed mailing address, which was McKENZIE's residence.

46.   On or about April 21, 2022, ASAC Valle interviewed W.S. by telephone regarding the PUA claim that had been filed in W.S.'s name.  Based on ASAC Valle's report, I know that W.S. told ASAC Valle the following:

a.   W.S. has never resided in, worked in, or visited the State of California.

b.   W.S. had never been employed as an assembler/production.

c.   W.S. never lived in Valencia, California.

d.   W.S. never filed a PUA claim with EDD.

L.   **Victim M.M.**

47.   As noted above, one of the EDD EBP debit cards that was found in McKENZIE's residence when it was searched was in the name of M.M.

48.  Based on my review of records provided to me by EDD and conversations with other agents and investigators who have participated in this investigation, I know the following:

a.  On or about February 4, 2021, a PUA claim in the name of M.M. was filed with EDD, stating that claimant M.M. was unemployed because of the COVID-19 pandemic.

b.  The PUA application contained M.M.'s name, DOB, SSN, and alleged that M.M. was employed as an assembler/production line.  The claim identified a last employer as Paramount Pictures.

c.  The claim listed McKENZIE's residential address as M.M.'s reported mailing address.

d.  The filing of the PUA claim triggered an EDD EBP debit card ending in 6329 in the name of M.M. to be generated and sent by U.S. Mail to M.M. at the listed mailing address, which was McKENZIE's residence.

49.  On or about February 7, 2022, ASAC Valle interviewed M.M. by telephone regarding the PUA claim that had been filed in M.M.'s name.  Based on ASAC Valle's report, I know that M.M. told ASAC Valle the following:

a.  M.M. has never resided in, worked in, or visited the State of California.

b.  M.M. was never employed as an assembler.

c.  M.M. never lived in Valencia, California, and was not familiar with the address xx841 Arroyo Park Drive, Apt. 812, Valencia, California 91355 (McKENZIE's residence).

d.  M.M. did not have any friends or associates who

reside in California.

       e.   M.M. never filed a PUA claim with EDD and did not authorize anyone to file a claim in his or her name.

       f.   M.M. did not know McKENZIE.

   **M.**   **Victim C.S.**

   50.  As noted above, one of the EDD EBP debit cards that was found in McKENZIE's residence when it was searched was in the name of C.S.

   51.  Based on my review of records provided to me by EDD and conversations with other agents and investigators who have participated in this investigation, I know the following:

       a.   On or about November 11, 2020, a PUA claim in the name of C.S. was filed with EDD, stating that claimant C.S. was unemployed because of the COVID-19 pandemic.

       b.   The PUA application contained C.S.'s name, DOB, SSN, and alleged that C.S. was employed as an assembler/production.  The claim identified a last employer as Paramount Pictures.

       c.   The claim listed McKENZIE's residential address as C.S.'s mailing address.

       d.   The filing of the PUA claim triggered an EDD EBP debit card ending in 9843 in the name of C.S. to be generated and sent by U.S. Mail to C.S. at the listed mailing address, which was McKENZIE's residence.

   52.  On or about February 7, 2022, ASAC Valle interviewed C.S. by telephone regarding the PUA claim that had been filed in C.S's name.  Based on ASAC Valle's report, I know that C.S. told

ASAC Valle the following:

        a.   C.S. has never resided or worked in, nor visited, California.

        b.   C.S. was never employed by Paramount Pictures.

        c.   During the pandemic, C.S. was employed by Dave and Busters.

        d.   C.S.'s employment was negatively impacted by COVID-19, resulting in C.S. receiving UI benefits in New York.

        e.   C.S. was not familiar with the address xx841 Arroyo Park Drive, Apt. 812, Valencia, California (McKENZIE's residence).

        f.   C.S. never filed a PUA claim with EDD and did not authorize anyone to file a claim in his or her name.

    **N.**    **Victim M.S.**

53.  As noted above, EDD mail in the name of M.S. was found in McKENZIE's residence when it was searched.

54.  Based on my review of records provided to me by EDD and conversations with other agents and investigators who have participated in this investigation, I know the following:

        a.   On or about August 16, 2020, a PUA claim in the name of M.S. was filed with EDD, stating that claimant M.S. was unemployed because of the COVID 19 pandemic.

        b.   The PUA application contained M.S.'s name, DOB, SSN, and identified M.S. as self-employed.

        c.   The claim listed McKENZIE's residential address as M.S.'s mailing address.

        d.   The filing of the PUA claim triggered an EDD EBP

debit card ending in 0146 in the name of M.S. to be generated
and sent to by U.S. Mail to M.S. at the listed mailing address,
which was McKENZIE's residence.

55.   On or about February 7, 2022, ASAC Valle interviewed
M.S. by telephone regarding the PUA claim that had been filed in
M.S's name.  Based on ASAC Valle's report, I know that M.S. told
ASAC Valle the following:

a.   M.S. has never resided or worked in the State of
California.

b.   M.S. was never self-employed or worked as a bank
teller.

c.   M.S. was not familiar with the address xx841
Arroyo Park Drive, Apt. 812, Valencia, California (McKENZIE's
residence).

d.   M.S. never filed a PUA claim with EDD and did not
authorize anyone to file a claim in his or her name.

O.   **Victim R.M.**

56.   As noted above, one of the EDD EBP debit cards that
was found in GLOVER's residence when it was searched was in the
name of R.M.

57.   Based on my review of records provided to me by EDD
and conversations with other agents and investigators who have
participated in this investigation, I know the following:

a.   On or about August 20, 2020, a PUA claim in the
name of R.M. was filed with EDD, stating that claimant R.M. was
unemployed because of the COVID-19 pandemic.

b.   The PUA application contained R.M.'s name, DOB,

SSN, and identified R.M.'s occupation as a cook.

      c.   The claim listed a residential address in Lancaster, California.

      d.   After the application was filed, the address was changed to xx015 Cooper Hill Drive, #4302, Valencia, California.[11]

      e.   The filing of the PUA claim triggered an EDD EBP debit card ending in 7444 in the name of R.M. to be generated and sent using the U.S. Mail in the name of R.M to the Valencia address, which was on GLOVER's mail route.

58.  On or about February 23, 2022, ASAC Valle interviewed R.M. by telephone regarding the PUA claim that had been filed in R.M.'s name.  Based on ASAC Valle's report, I know that R.M. told ASAC Valle the following:

      a.   R.M. resides in Little Rock, Arkansas.

      b.   R.M. has never resided or worked in the State of California.

      c.   R.M. was never employed as a cook.

      d.   In or about April or May 2020, R.M.'s employer informed R.M. that R.M.'s identity had been stolen.

      e.   R.M. was not familiar with the Valencia address to which the EDD EBP debit card in his/her name had been mailed. (As noted above, that was an address on GLOVER's USPS mail route.)

---

[11] xx015 Cooper Hill Drive, #4302, Valencia, California was an address on GLOVER's USPS mail route. Review of text messages between GLOVER and McKENZIE revealed the address was supplied to McKENZIE as an address that could be used.

f.    R.M. never filed a PUA claim with EDD and did not authorize anyone to file a claim in his or her name.

g.    R.M. did not authorize anyone to possess mail in R.M.'s name at any addresses including the above referenced Valencia address.

**P.    Victim K.Br.**

59.  As noted above, an EDD EBP debit card in the name of K.Br. was found in GLOVER's residence when it was searched.

60.  Based on my review of records provided to me by EDD and conversations with other agents and investigators who have participated in this investigation, I know the following:

a.    On or about August 24, 2020, a PUA claim in the name of K.Br. was filed with EDD, stating that claimant K.Br. was unemployed because of the COVID-19 pandemic.

b.    The PUA application contained K.Br.'s name, DOB, SSN, and identified K.Br.'s occupation as a cook.

c.    The claim listed a residential address in Hesperia, California.

d.    After the application was filed, the address was changed to an address in Valencia on GLOVER's mail route.

e.    The filing of the PUA claim triggered an EDD EBP debit card ending in 9467 in the name of K.Br. to be generated and sent by U.S. Mail to K.Br. at the Valencia address, which was on GLOVER's mail route.

61.  On or about February 23, 2022, ASAC Valle interviewed K.Br. by telephone regarding the PUA claim that had been filed in K.Br.'s name.  Based on ASAC Valle's report, I know that

K.Br. told ASAC Valle the following:

    a.   K.Br. resides in Texas.

    b.   K.Br. has never resided or worked in the State of California.

    c.   K.Br. was not familiar with the Valencia address to which the EDD EBP debit card in K.Br.'s name had been mailed.

    d.   K.Br. never filed a PUA claim with EDD, and did not authorize anyone to file a claim in his or her name.

    e.   K.Br. did not authorize anyone to possess mail addressed to K.Br. at any addresses, including the above referenced Valencia address.

    Q.   **Other stolen mail**

    62.   As noted above, different pieces of EDD-related mail addressed to the same person, S.M., including an EDD EBP debit card ending in 6752, were found at separate locations - at GLOVER's residence and the residence of his girlfriend A.D.[12]

    63.   On or about February 23, 2022, ASAC Valle interviewed S.M. by telephone regarding the EDD mail addressed to S.M. that was seized during the searches of the GLOVER and A.D. residences.  Based on ASAC Valle's report, I know that S.M. told ASAC Valle the following:

    a.   S.M. currently resides in Castaic, California, but previously resided at xx853 Arroyo Park Drive, Apt. 309, Valencia, California 91355 (an address on GLOVER's mail route).

---

[12] During his interview with law enforcement, GLOVER admitted to stealing and storing mail matter at his girlfriend A.D.'s home.

b.    S.M. had not received EDD benefits since 2017, and was unaware of how an EDD EBP debit card would have been issued in his/her name and sent to his/her previous address.

c.    S.M. was not impacted by the COVID-19 pandemic.

d.    S.M. did not authorize anyone to possess mail, to include correspondence from EDD and/or an EDD EBP debit card addressed to S.M.'s previous address on Arroyo Park Drive in Valencia, CA 91355.

R.    **GLOVER's termination from USPS employment**

64.  Based on my review of investigative reports and my conversations with other law enforcement officers and agents who have participated in this investigation, I am aware of the following:

a.    On or about June 17, 2021, the USPS suspended GLOVER without pay from his position as a mail carrier for potential loss of mail or funds.

b.    On or about August 18, 2021, USPS informed GLOVER in writing of a Notice of Removal (NOR) from his position of mail carrier.  The NOR informed GLOVER that the USPS intended to terminate GLOVER within 30 days from the date of receipt of the letter (August 25, 2021). The reason for the NOR was "failure to follow instructions/unacceptable conduct-mail theft." Specifically, the NOR referenced the following reasons for the actions taken by the USPS in part:

i.    Possession of EDD mail and other mail matter by GLOVER at his residence and vehicle.

ii.    Admission to law enforcement that GLOVER had

44

stolen mail on route 046 in zip code 91355.

## V.   <u>CONCLUSION</u>

65.   Based on the information set forth above, there is probable cause to believe that Stephen GLOVER and Travis McKENZIE violated Title 18, United States Code, Section 1341 (Mail Fraud).

66.   Therefore, I respectfully request that the Court issue the complaint and two arrest warrants.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>13th</u> day of May
2022.


**DOUGLAS F. McCORMICK**
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE